# CASES

### ARGUED AND DETERMINED

#### IN THE

# SUPREME COURT OF ILLINOIS.

THE LOCEY COAL MINES

*v.*

THE CHICAGO, WILMINGTON AND VERMILION COAL COMPANY.

*Filed at Ottawa October 31, 1889.*

1. REAL AND PERSONAL PROPERTY—*mining property—lands, buildings, machinery, etc.* Coal lands of a mining corporation in the hands of a receiver, with the buildings erected thereon, the coal lying beneath the surface, and the various shafts and mines by means of which the coal is reached, and the right to take coal from other lands, are to be treated as real estate. Dwelling houses, and a boarding and store house on such land, are, presumptively, at least, parts of the realty; and the same thing may be said of the engine and boiler, railroad and switch tracks, coal tracks, docks, and most of the other apparatus and machinery erected upon and attached to the land for the purpose of carrying on the company's mining operations.

2. But the machinery of such company not so attached to the soil as to become fixtures, its tools, boats, mules, and stock of goods in its store, are personal property.

3. REDEMPTION—*from judicial sale—as to mining property, consisting of realty and personalty combined.* The mere fact that real and personal property are so brought together in a particular business enterprise, and are so related to each other as to be more available and valuable in combination than when taken separately, will not, of itself, authorize the sale of both as a unit, without redemption.

4. The property of a coal mining company in the hands of a receiver, consisting of lands and other real estate and personalty, was, on a creditor's bill, ordered to be sold as a unit, and without redemption: *Held,* that it was error to require the sale of the realty without redemption. The personal property should have been ordered to be sold separately by the receiver, and the land by itself, with the statutory right of redemption.

Writ of Error to the Appellate Court for the Second District;—heard in that court on writ of error to the Circuit Court of Will county; the Hon. Dorrance Dibell, Judge, presiding.

Mr. H. S. Monroe, for the plaintiff in error:

The court had no authority to order sale of the entire property of the corporation without redemption. Rev. Stat. chap. 77, secs. 16-18; *Stone* v. *Gardner,* 20 Ill. 309; *Suitterlin* v. *Life Ins. Co.* 90 id. 483; *Wetherbee* v. *Fitch,* 117 id. 67; 110 id. 310; *Railroad Co.* v. *Thompson,* 103 id. 187; *Hammack* v. *Loan and Trust Co.* 105 U. S. 77.

Mr. George H. Locey, also for the plaintiff in error.

Mr. George S. House, for the defendant in error:

When the property will sell for more as a unit than if sold separately, it may be sold together. *McLean County Bank* v. *Flagg,* 31 Ill. 290; Rev. Stat. 1845, chap. 57; *Hammack* v. *Loan and Trust Co.* 105 U. S. 77.

Mr. Justice Bailey delivered the opinion of the Court:

This was a creditor's bill, brought by the Chicago, Wilmington and Vermilion Coal Company against the Locey Coal Mines, to enforce the collection of a certain judgment at law against the defendant. It appears from the bill, which for want of an answer was taken *pro confesso,* and from the proofs adduced at the hearing, that on the 8th day of February, 1887, the complainant obtained a judgment against the defendant by confession for $6903.65 and costs, and that execution is-

sued on said judgment had been returned wholly unsatisfied. It further appears that the defendant is a corporation organized under the laws of this State for the purpose of carrying on the business of mining and selling coal, and that in the prosecution of its business it had acquired and at the time of filing said bill held and owned certain mining lands situate in Bureau county, consisting of two hundred and eighty and thirty one-hundredths acres, and in addition thereto, the coal under two hundred and eleven and seventy-one one-hundredths acres of other land adjoining, and had sunk upon said land a coal mining shaft, and an escapement or air shaft, and erected some thirty dwelling houses, a boarding house, a store house and various other buildings, and set a steam engine, steam boiler, coal hoisting apparatus and machinery, pumps, coal car tracks, railroad and switch tracks, screens, pit scales and car scales, and constructed on the Illinois river a loading dock, and procured for the transportation of coal one coal boat and a steam barge or towing boat, all of which were desirable and necessary for carrying on its business of mining and selling coal. This property was owned by the defendant subject to a trust deed executed by the defendant to Charles S. Hinchman to secure the payment of $30,000 and interest and also a mortgage to Edward Lewis to secure the payment of $1838.35.

The bill further alleges that the defendant has carried on its business at a large expense, and has acquired a valuable trade for its mining products, and a standing in the market which should not be lost; that the defendant's property is of that character that its chief value consists in maintaining it as it now exists for the transaction of the business for which it was brought together, and that the interests of all concerned will be better promoted by preserving all of said property as a unit; that the defendant is greatly embarrassed financially, and is unable to meet its debts due and to become due, and that the interest on said incumbrances remains due and un-

paid; that the defendant is about $7000 in arrears in the payment of the wages of its miners, and has no means with which to pay the same, and that by reason of such non-payment, said miners have quit their work and refuse to resume the same until proper arrangements are made for the payment of their wages.

Upon the filing of said bill an order was entered, the defendant by its counsel consenting thereto, appointing a receiver, and requiring the defendant to turn over to such receiver all its assets and property, and by the same order the receiver was directed to continue the defendant's business of mining and selling coal. In pursuance of said order the defendant conveyed and transferred to the receiver all of its said property, and the latter thereupon entered into possession and undertook to carry on the business of operating the mine. To enable him to commence operations, an order was entered, on his petition, authorizing him to borrow $10,000 and issue receiver's certificates therefor, and the money thus borrowed was expended in paying the operatives their arrearages and in defraying the expenses of continuing the business. On petition of the defendant the receiver was authorized to buy three hundred acres more of mining rights, which purchase was accordingly made at a cost of $3200. Subsequently the complainant having become the owner of the indebtedness secured by the $30,000 deed of trust and also of all the certificates then issued by the receiver, filed its petition asking for an order authorizing the receiver to borrow a further sum to be expended in improvements of said property, and offering to advance the same on receiver's certificates, and the defendant consenting thereto, an order was entered in accordance with the prayer of said petition, and in pursuance of said order, the receiver borrowed of the complainant the sum of $15,900.

Said cause coming on for hearing on the bill taken as confessed, a large amount of evidence was introduced as to the value of the property and assets of the defendant in the hands

of the receiver, said evidence being to a very large degree conflicting. The decree found, "That the property is of that kind and character, all so related each to the other, and thus gathered together and obtained for the transaction of the business of the mining and sale of coal, that the said property cannot well be sold separately without manifest injury to the interests of all interested therein, and that all said property, including the personal property on hand, at the time of sale of every kind and character, should be sold as an entirety, and as one property, as a unit, to better conserve the interests of all parties interested therein; that the value of all of said property rights does not exceed the sum of $60,000, and that the said corporation defendant is entirely insolvent and wholly unable to pay its debts; that the claims now existing against the said corporation defendant now proven in this cause, together with the expenses, costs and charges still likely to accrue and arise under the receiver, will reach the sum of at least $85,000, and the property is of that kind and character that for its proper preservation, its operation as a coal mine is absolutely necessary and essential; that its continued operation under a receiver is not only unwise and injudicious, but may be greatly prejudicial to the rights and interests of the creditors of said corporation, and that all said property, both real and personal, should be sold without unreasonable delay, and on account of the property and its value, as compared with the claims due, and the scant security thus afforded for such claims, it should be sold without redemption, and free and clear of any and all claims of any and all parties to this cause, whether intervenors or otherwise."

Said decree has been affirmed by the Appellate Court, and the record is now brought here by writ of error. The errors assigned in this court relate, first, to that portion of the decree which orders the sale of the real estate in question without redemption; and second, to that portion of the decree which finds the value of all the property in question to be only

$60,000. The second assignment of error does not seem to be insisted upon, and the only question therefore presented for our consideration is, whether the Circuit Court properly ordered the sale of the real estate without redemption.

There can be no question that the property transferred to the receiver and which the decree orders to be sold is, in the main, real property. Such is of course the character of the two hundred and eighty and thirty one-hundredths acres of land to which the defendant had obtained the title in fee, and that character appertains not only to the soil and the buildings erected thereon, but to the coal lying beneath the surface, and the various shafts and mines by means of which the coal is reached and the mining operations carried on. The right which the defendant had acquired prior to the filing of the bill to the coal under the two hundred and eleven and seventy-one one-hundredths acres is an interest in land and is in its nature real property. The same is true of the mining rights acquired by the receiver under the order of the court. The thirty dwelling-houses, the boarding house, the store house and the other buildings are all, presumptively at least, parts of the realty. The same thing may perhaps be said of the engine and boiler, railroad and switch tracks, coal tracks, docks, and most of the other apparatus and machinery erected upon and attached to the land for the purpose of carrying on the defendant's mining operations. There is, it is true, a considerable amount of property owned by the defendant and procured by it for use in and about its mines, which is in its nature personal property. Of this character is its machinery not so attached to the soil as to become fixtures, its tools, boats, mules, and the stock of goods in the defendant's store. All of these however constitute relatively but a small portion of the entire mining establishment, as the inventory of the movable property shows that the goods in the store amounted only to $1915.31 in value, the mining property to only $1924, and the boats only $632.40.

The bill alleges and the decree finds that the various portions of the entire property are so related to each other, and the business purpose for which it is chiefly valuable is such, that the best interests of all concerned will be best promoted by having the entire property kept together and treated as a unit. This is because its principal value consists in its being operated as a coal mine. Upon this feature of the case there was no controversy at the hearing and there need be none now. We are of the opinion, however, that the conclusions sought to be drawn from it do not necessarily follow.

It need not be questioned that a division of the mining lands embraced in the decree into a number of parcels and selling them in such parcels, would not be the best course to pursue in order to realize the highest price. Such division would doubtless greatly impair if not altogether destroy the value of said lands as mining lands. The expense of sinking the necessary shafts and erecting and supplying proper machinery and appliances is doubtless too great to make mining profitable if limited to a small tract of land. In case the lands in question should be divided and go into the hands of several proprietors, this large expense would need to be incurred upon each tract in order to make it available as mining property. It may therefore be admitted that, in order to obtain the highest price, the mining lands of the defendant, including the shafts, mines, buildings, machinery and other improvements appertaining to the realty, should be sold together and not in parcels.

But, so far as we are able to perceive, the same considerations do not necessarily apply to the comparatively small amount of personal property of the defendant which it has purchased and brought together for use in and about the mines. If that should be sold separately and thus go into the hands of a purchaser different from the one who buys the mines, there would be no material injury thereby occasioned to the mines or to the parties interested therein, since other personal

property equally serviceable could doubtless be obtained in the market at its fair cash value. Such would unquestionably be the case with the stock of goods, the tools, portable machinery, mules, and indeed all the goods and chattels which may be said to form a part of the property appurtenant to the mines. It does not necessarily follow therefore that the case presents any such combination of real and personal property into an indissoluble unit, as will make it impracticable to sell each species of property separately and in accordance with the general rules of law applicable thereto, without destroying or greatly impairing the value of the entire property.

Our present statute provides that, when any real estate is sold by virtue of an execution, judgment, or decree of foreclosure of a mortgage or enforcement of a mechanic's lien or vendor's lien, or for the payment of money, it shall be the duty of the sheriff, master in chancery or other officer making the sale, to deliver to the purchaser a certificate entitling him to a deed in case the property is not redeemed within the statutory period of redemption. R. S. Chap. 77, Sec. 16. The language of the statute is imperative and seems to contemplate no exceptions. Why then should the real estate which constitutes the great bulk of the property in question be sold without redemption? In support of the decree authorizing such sale we are referred to *Hammock* v. *Loan and Trust Co.* 105 U. S. 77, and *P. & S. R. R. Co.* v. *Thompson*, 103 Ill. 187.

These were suits in chancery, each brought for the foreclosure of a mortgage executed by a railway company conveying its railroad with the appurtenances, franchises, equipments, tools, incomes, assets and property belonging thereto, then possessed or thereafter acquired by the company, and in each case a decree for the sale of the entire mortgaged property as a unit, and without redemption, was sustained. This conclusion was reached upon the theory that, while a railway track, considered by itself, was real estate, yet when viewed in connection with its public character and the franchises usually

connected with it, it could not be regarded as lands and tenements within the meaning of the statute.   On this point, in *P. & S. R. R. Co.* v. *Thompson*, it is said:   "A number of reasons suggest themselves to us why they should not be so considered.   In the first place, when a railway, its appurtenances, privileges and franchises are mortgaged as a whole, there is, in our opinion, no power or authority to sell them separately. From the very nature of the property one would be useless without the other.   The franchise could not be used at all without the road, and the road could not lawfully be used, as against the State, without the franchise.   Under such circumstances, to avoid the possibility of conflicting ownerships, the law has wisely determined that both must be sold as an entirety."   Again, "While a railroad franchise, when considered by itself, will be treated as personal property, and the road itself, when so viewed, will be treated as realty, yet when considered as an entirety, as they must be when so mortgaged and sold, they are, strictly speaking, neither the one nor the other, within the meaning of the law pertaining to redemptions. From a sale of land a redemption is allowed,—from a sale of personal property no such redemption is permitted; and since the two are indissolubly combined, by virtue of the mortgage, decree and sale, there is just as much reason, so far as the question depends upon the two kinds of property when separately considered, for contending the right of redemption is denied, as there is that it is given."   A further consideration bearing upon the question is drawn from the public character of railway companies.   On that point it is said:   "In view of the public character of the road, it will not be questioned that the public generally have a direct interest in keeping it continuously open, without any material diminution of its capacity to meet all the legitimate wants of the public.   It is therefore but just and proper that the foreclosure proceedings should be conducted in such a manner, having due regard to the private interests of all parties concerned, as to cause the least possible

2—131 ILL.

injury and inconvenience to the public, and we are of the opinion that this will be more effectually accomplished by the method adopted than in any other way.   To have ordered a sale of the personal property separately, from which it is conceded there would be no redemption, and a sale of the realty with the right of redemption, as is claimed should have been done, it would most likely have resulted either in a sacrifice of the property, or some portion of it, or in embarrassing complications seriously affecting, at least for a while, the public interests."

It is clear that very little if any of the foregoing reasoning can have an application to the present case.   Here there is no question of a franchise the existence and exercise of which is essential to the legal use and enjoyment of the tangible property.   No personal property is involved the severance of which from the real estate will materially impair the value or usefulness of the latter.   No question arises of any public use, nor has the public any interest in the continued operation of the mines, beyond what it has in the continued prosecution of any other private business enterprise.   Every circumstance which may be held to take the case out of the operation of the statutory mandate which requires judicial sales of real property to be made subject to the statutory right of redemption seems to be wanting.   While we are disposed to adhere to the doctrine of the cases above cited, we are not inclined to extend the rule there laid down to cases which do not come clearly within the reasons upon which the rule is based.

The mere fact that real and personal property are so brought together in a particular business enterprise and are so related to each other as to be more available and more valuable in combination than when taken separately, will not of itself authorize the sale of both as a unit, without redemption.   If this were otherwise, the right of redemption which the statute gives in all ordinary cases of judicial sales of real property might be denied or set aside almost with impunity.   Thus, in

case of a farm well stocked with domestic animals, agricultural implements and other chattel property specially adapted to its profitable tillage, we might have a combination of real and personal property more valuable when treated as a unit than when separated. A well furnished house, with carpets, furniture and other belongings specially purchased, adapted and fitted for use in such house, would constitute a combination of real and personal property more valuable to the proprietor, and more available perhaps for sale, if it could be sold as a single item of property. But it has never been held that in either of these cases the real estate becomes anything but real estate and subject to judicial sale as such. Nor has it ever been held that a separation of the personal from the real property would be unauthorized, even though its effect would be to essentially diminish the market value of both. So long as the law recognizes the distinction between these two classes of property and subjects them to different rules, those rules must apply and can not be dispensed with by the courts, even though their application may work some inconvenience.

It is suggested as a further argument *ab inconvenienti* in support of the decree, that if the statutory redemption is allowed, neither the receiver, the defendant nor the purchaser can be permitted to mine coal after the sale and while the period of redemption is running, and that in order to keep the mines from deterioration and injury during that period, the water must be kept out, fresh air supplied, etc., at a cost of about $400 per month. This expense should not be borne by the receiver, as he can no longer work the mines, since his doing so would simply be a subtraction or taking away of a portion of the property sold. The defendant, being insolvent and presumably unable in any event to redeem, would have no inducement to incur such expense, since for the same reason above stated, it could not be permitted to operate the mines during the period of redemption. The purchaser, on the other hand, would be entitled to possession only after the

redemption has expired, and so could not legally enter upon
the mines for the purpose of protecting them from deteriora-
tion.[14] These inconveniences doubtless may arise, but they do
not, in our opinion, justify the court in disregarding or over-
riding a plain and positive mandate of the statute. Inconve-
niences the same in character, though perhaps less in degree,
not unfrequently grow out of the possession and use of real
estate during the period of redemption, but the statute is gen-
eral in its terms and makes no exceptions because of them.

Counsel also seek to sustain the decree on the ground that
the court, through the receiver, had the entire control of both
the equitable and legal title to the real estate in question, and
could dispose of it in such manner as it saw fit. Said prop-
erty was conveyed to the receiver by the defendant in obedience
to an order of the court requiring such conveyance. It is true
said order was entered with the consent of the defendant, but
the validity and effect of the order and the power of the court
to enter it in no way depended upon such consent. The con-
trol which the court obtained over the property was no different
or greater than it would have been if the order had been en-
tered as the result of adversary proceedings and against the
opposition and protest of the defendant. The question then
arises whether, on a creditor's bill, a court, by requiring real
property which might have been seized and sold on an execu-
tion at law to be conveyed to a receiver, can thereby take it
out of the operation of the statute in relation to redemption.
A creditor's bill may be viewed as a species of process for the
execution and enforcement of a judgment at law, and it is
difficult to see why real property seized and sold in that pro-
ceeding should not be subject to redemption the same as when
sold on execution.

Our present statute is somewhat broader than the one pre-
viously in force. The former statute seemed to limit the right
of redemption to sales upon execution, upon foreclosure de-
crees, and proceedings to enforce mechanic's liens, but by the .

revision of 1874 it is made to apply to all cases of real estate sold "by virtue of an execution, judgment, or decree of foreclosure of a mortgage, or the enforcement of a mechanic's lien, or vendor's lien, *or for the payment of money,*" and it is made the duty of the sheriff, master in chancery *or other officer* making the sale, to execute to the purchaser a certificate of purchase made expressly subject to the right of redemption.    It seems very clear that the statute, since the revision, is broad enough to embrace cases like the present.    The sale ordered by the decree is to be made by an officer of the court, viz, the receiver, and is to be made for the payment of money, viz, the amount due on the complainant's judgment.

In no view we are able to take of the case can the decree be sustained.    It should have provided for the sale of the real estate separately and subject to the statutory right of redemption.    The judgment of the Appellate Court and the decree of the Circuit Court will be reversed, and the cause will be remanded to the latter court for further proceedings not inconsistent with this opinion.

*Judgment reversed.*

Mr. Justice Wilkin: I do not concur.    I think the evidence in this record fully justified the finding of the circuit court, and that in such case a court of equity may properly order property belonging to a corporation, used by it in carrying on its corporate business, to be sold as a unit, and without redemption, notwithstanding a part of such property may be real estate.    It is unlike a case in which individual property is ordered sold.